Good afternoon, your honors. With less than two weeks' notice, we come here with great pleasure today, and we appreciate the opportunity before the courts. May it please the court. Mr. Cortez was one of 17 inmates to die in the Galveston County Jail while Kathy White acted as a supervisor at the jail in the capacity of either a director of nursing or a director or the health care administrator of the jail over all medical in the jail. The magistrate's opinion stated that even when I bend over backwards, he cannot find deliberate indifference in this case. The problem is that he's not the finder of fact. Case law establishes what deliberate indifference is, and we believe and we know that deliberate indifference occurred in this case on several fronts. There are several issues that occurred in this case that we've addressed in our briefs, and primarily, one of the issues is the admitted policies that existed in the jail at the time that Mr. Cortez was in custody. There was an admitted policy that the jail allowed LVNs to care for patients, and their description of care is pretty broad. They acted as the gatekeepers in the jail of adequate, qualified medical providers from getting to, excuse me, from inmates getting to adequate medical care through providers. Let me stop you there, Ms. Lewis. I'm reading from the Texas Occupational Code about the duties that a vocational nurse may perform, and one of those includes performing focused nursing assessments of the health status of an individual. So, are you saying that the Yes. Why? In the capacity that they use the LVNs. Well, focused nursing assessments of the health status of an individual. Right. So, that's a limited purpose that they can operate under the code. What fact shows that they went beyond that? The facts are well within the record and the medical records here. Will you tell me what the facts are? Sure, Your Honor. So, Mr. Cortez complained on numerous occasions of him being unable to breathe, and in doing so, he put in sick call requests, numerous sick call requests, and it was the LVNs that actually examined him. And when I say examination, which is different than an assessment, examine him, meaning they are the ones who diagnosed him with clear lungs, that he was fine and his lungs were clear, although they are not trained or nor are they allowed under the code to perform this type of examination. Why aren't they not allowed to assess the lungs, the breathing of someone who's complaining? That well, part of the reason why is they're not trained to do so. How do I know that? Well, this is a certificate program, Your Honor, and it's a very limited scope. And on top of that, Your Honor, they actually have to be supervised even with the assessments. And assessments include small tasks, but important tasks like taking vital signs, reading a temperature, reading a, taking weight of the patient, tasks like that. So obviously they have to assess someone who's complaining of a health problem. Yes. So they have to do that. Are you saying that there was a misdiagnosis here, they missed it? Well, what I'm saying is that there should not have been a diagnosis at all by the LVN. What I'm saying is that with their assessment that this patient came in, we've taken the vitals, they've complained they're not able to breathe, that's the assessment. Now with that information, they are to take that to a physician, not send the inmate back to the cell and say that he's fine. That's what the issue is, is that they're actually acting as a barrier, a shield from adequate care from somebody that can actually assess the patient properly. And for example, we have a video that occurred in this case where you can actually see this LVN using the stethoscope to purportedly examine the patient. Our expert shows that she did it absolutely incorrectly because she wasn't trained to do that. You have to show deliberate indifference here. Yes. That is something more than even medical malpractice. Do you agree with that? I do. Okay, so where's the evidence of deliberate indifference? Meaning we knew about a problem, we just ignored it. Well, there's several instances in this case, Your Honor. So one, they knew about his inability to breathe. He started to complain on May 22nd in 2017 of his inability to breathe. It occurred after he fell off the top bunk after complaining about not being able to get on the bottom bunk. But he started to complain about his inability to breathe on May 22nd. That was his first inclination. Now, on May 22nd, he saw an LVN. The LVN did not take that information that she assessed from the patient and forward it to the doctor as she's supposed to under the code. And on the 22nd the code says that her duty is to assess and report. And she did not, there was not an assessment and report. And there's a policy, the policy that's here in the jail doesn't even, there's not a policy that they should. The policy is that when inmates are in the jail, they present their complaints in a sick call request. And the nurses are the ones that go through the sick call request and determine whether the patient should be escalated to see a physician. The physician doesn't even lay eyes on the patient. These LVN nurses determine that your sick call request does not warrant treatment from a qualified provider, which, and when I say provider, it's a term of art. It means a physician or a nurse practitioner or a physician's assistant. That's it. Not an RN, not an LVN. So it's the sick call request that the LVNs peruse through and they decide at that point whether they will allow an inmate to see a physician. And you'll see Mr. Cortez actually went further than most inmates beyond the sick call request when he tried to get treatment on, after May 22nd and went so far as to request a grievance. He, the grievance that he filed was against the actual LVN saying she's not treating me and she's sending me back to jail. And mind you, he was arriving in a wheelchair and he didn't come into jail in a wheelchair. The guards recognized his serious medical needs. They don't just wheel inmates around jail for the fun of it in a wheelchair. And he was, he would go to the medical department in this wheelchair, complain of inability to breathe, sit back to a cell in the wheelchair and still have to climb up to the top bunk. And this is something that even the jailers, as I stated, recognized. Had the situation changed at some point? It was. It was, so after the 22nd, May 22nd, after he saw the LVN he was sent back. He came back, the guards brought him back the next day. And, I'm sorry, there were two appointments on May 22nd, later in the day. And that's when he was able to see Dr. Killian for the first time. And Dr. Killian did actually provide him with a bottom bunk pass. Because, ironically, LVNs cannot provide bottom bunk passes, but they can, in the jail, assess patients. I was assuming, arguendo, that everything you say about the LVNs shouldn't have been doing this to begin with is true. Just assume that the district, the magistrate judge in the district court relied upon the idea that, you know, unfortunately the decedent had to have had mesothelioma, this aggressive disease, and that he didn't have more than a 50% chance of survival. So even if they had given him, you know, the Mayo Clinic treatment, it didn't matter. It mattered for, you know, it's an unfortunate, sad thing, but it's not actionable under 1983. What do you say to that? Well, Your Honor, what I say to that is that that has not been applied to a single 1983 case ever, as it relates to... So you believe that's the wrong standard? I do. If that is the right standard, is there any evidence in the record that would show that he had more than a 50? Because I thought your own expert said it was aggressive and bad. Right. So, Your Honor, in assuming that it is true, we believe that there are cases that show that if there's an intervening factor, then that you can consider the intervening factor, meaning he didn't get a chance to die from mesothelioma. He was in stage two, possibly three, of mesothelioma when he died. It was because he was forced to undergo emergency procedure, which was dangerous. Even their own expert acknowledged that that procedure was dangerous. That procedure included a draining from the four liters, that's two Coke bottles of fluid, in his lungs that he developed when he was complaining all the days from the 22nd to the 31st that he could not breathe. And I want to point out one thing. They explain that LVN care from the 22nd, let's say they are qualified to care. There's no explanation for him not receiving care between the 23rd and the 29th when he still continued to submit sick call requests saying, I cannot breathe. And we know what he was saying was true because he ultimately was diagnosed with the four liters of fluid in his lungs. Now, because it ended up being four liters of fluid in his lungs, the hospital, once he arrived, only had a choice, had limited choices. And so normally, according to both experts, what you would want to do if somebody has fluid on their lungs, you would want to drain that fluid slowly, no more than a half of a pint and a half or a, sorry, a liter and a half or if you have to, two liters. In this case, they were forced to do two liters back to back because there was so much fluid on his lungs. And their expert, the defense expert, explained that if you do, if you take more blood out than is recommended, there is a phenomenon that a patient could experience called rapid lung re-expansion. And I asked, and he was asked, is this what occurred with Mr. Cortez? And he said, yes, it did. And so that caused the ARDS, which is the acute respiratory stress syndrome, the complication for mesothelioma that Mr. Cortez died from ultimately. So he was cut off from actually dying from the mesothelioma. And our expert in his declaration explained that it was the ARDS that actually took his life, although he did have a fatal disease. And he did not actually get a chance to die from the disease. You're saying that an error in the way that the fluid was drained from his lungs is what killed him. Not an error. They were forced to I thought you just said it was supposed to be done more slowly and it was instead done Well, I apologize if that is how it came off. No, it wasn't, they were forced, they had no choice but to drain that much in that way. Otherwise, that was the only, they were posed with four liters when he arrived. And they didn't have the opportunity to do the recommended amount of draining. So if they would have acted earlier, they could have done smaller amounts. Exactly. Your point. Yes, that's my point. So did you want to argue, and I didn't mean to cut you off from the 1983 survival 50% rule on the legal point. Yes, so on the 50, so on the Slade case is what the case that they're relying on a lot on the Slade versus City of Marshall. That case was, first of all, the plaintiff in that case did not have any type of causation evidence whatsoever. Secondly, that plaintiff asked for the, pled the last chance of survival, which is absolutely different than the less than 50% chance rule. And there, this is confused here in the opinion and in the briefing. These are two totally different concepts, two totally different doctrines. The last chance of survival is a plaintiff's theory and doctrine. The last, the 50% chance of survival, that is a defense theory in a medical malpractice claim. And it's never been applied to a 1983 case. So it doesn't apply under the Texas Wrongful Death Act? No, it doesn't. Causation does. And we have to prove causation. We understand that based on the wrongful death statute. However, that defense is not required. And again, it's never been applied. So if I were to look in the Texas case law in detail, I would not find them using that standard? Not for a civil rights deliberate indifference claim. Would I find it for a wrongful death claim? Yes, you would, as it relates to medical malpractice claims. Okay. Yes, ma'am. I thought the magistrate judge's opinion was very well done. What are the crucial errors that you can then evade? What are the crucial errors in the magistrate judge's opinion? Well, the reversible errors are taking the disputed facts and determining them when a jury should be the one who determines the disputed facts here. We have a disputed fact, as it relates to, if nothing else, the survival claims, the pain and suffering that he dealt with leading up to his death. We also have the conditions of confinement with the bottom up pass policy being deliberate indifference to a person who is dizzy and says that they cannot reach the top bunk, or a person who says they don't have the strength. That policy is something that I think that a reasonable jury could differ as a fact issue, whether that was a legit, whether there was a legitimate governmental purpose for that. I'm sorry, my time is up. Thank you very much. Thank you. Your time is up. My name is Andrew Johnson. I'm here presenting on behalf of the medical defendants. This is not a case where the defendants knew of, but deliberately disregarded a substantial risk of serious harm to Mr. Cortez. In the seven and a half weeks he was at the jail, he was treated numerous, numerous times. The argument is the LVN shouldn't have been doing this. Sure. First of all, Your Honor, I want to point you to two cases where this court has held that, where a defendant complains, I should have seen a doctor, I shouldn't have seen a nurse, was not upheld on appeal. It's the Saldivar v. Davis, 698 Federal Appendix 198, that's the Fifth Circuit of 2017. And Smallwood v. Alexander, 68 Federal Third, 472, and that's Fifth Circuit 1998. In that case, the defendant argued, in the Smallwood case, they're giving the nurses too much discretion to decide what's going on with my health. And the court said, no, that is not a deliberate indifference. Complaining that I should have seen a doctor when I, and instead I saw a nurse, is getting to the quality of care. It's not getting to, I'm deliberately indifferent to your medical treatment. And as Judge Duncan pointed out, the LVN statute specifically says, collecting data and performing nursing assessments of health status of an individual. That's what these nurses did. When he came in complaining of things like a sore throat, or the chills, or heartburn, they assessed him, they took his vitals, they gave him ibuprofen if he needed it, and they sent him on his way. We're not talking about that. We're talking about when he said he couldn't breathe. Right, okay, exactly. So when he did come in and said, had a serious complaint, I can't breathe, they did assess him. They took his vitals, they looked at his lungs. That very day, May 22nd, is when Dr. Killian came in and assessed him. Took his vitals, looked at everything on that day, and decided that day gave him his... He was complaining about shortness of breath before that, hadn't he? I believe that the 22nd was the first time that he really came in and, in a medical assessment, said that that was the first time he was really suffering from shortness of breath, I believe. If the records showed that he said he couldn't breathe, other times he was having trouble breathing, functioning? Well, in those situations, the nurses assessed him, they measured him, they looked at his lungs and found that his lungs were clear. How were they looking at his lungs? Through a stethoscope. Giving an assessment, asking him. Were they listening to his lungs? Right. Okay, you just said looking at his lungs, and so I don't think they're doing an X-ray or a CAT scan or something. Right, they don't have X-ray vision. They're listening. Right, right. And when he came in that day, he himself said, this is a sinus issue, I think I'm having sinus problems, that's why I'm having shortness of breath. Three separate times after that, they assessed him, looked at his lungs, listened to his lungs, they sounded clear. And then it was on May 31st when they listened to it and said, something is wrong here. That's the day, the only time in the medical records where it shows that something here sounds unclear. Do LVNs have training on how to listen to your lungs? I'm not familiar with whatever experience LVNs have to a T like that. But they are, under the statute, they are provided to give assessments, give nursing training, things like that. Do they have to do it under the direct supervision of another healthcare professional, or can it be more tangential, the supervision? Right, I believe it can be more tangential. I don't think the statute says. It says they have to have under supervision of a registered nurse, there were RNs there, or a physician. And I don't think it has to mean someone else has to be in the room at the same time. That's not what the statute says. So when they finally did see that his lungs were unclear, he wasn't passing enough oxygen out of his right lung, they brought in Dr. Killian, he assessed it, immediately sent him to an ER. After that, they didn't even cease. They continued to reach out to Memorial Hermann, the hospital, followed up with him, continued to do care, even when they were no longer in his treatment. I mean, this is not a case of deliberate indifference where they cast an inmate aside in a jail cell and didn't care what happened to him. They repeatedly, every time he made a complaint, they saw him, they addressed it. I want to address briefly the top bunk situation. They saw him three times about that. On April 19th, he met with a nurse. They determined he had no history of blood pressure problems. He was educated at that time, don't sit up too fast in your bed, don't get dizzy, don't jump down for your bunk, and you don't meet the criteria for a bottom bunk pass. He was again seen on May 5th, and he was again seen on May 19th at the time the nurse told him, you've had a physical. He actually had a physical while he was in jail. That's the degree of medical care they gave him. They gave him an eye exam and a tooth exam and a prostate exam. They did blood work. I mean, they were checking this guy out and taking good medical care of him. And that day again, they told him, don't drink any liquids after 7 p.m. so you don't have to use the restroom and get up during the night, and take your time moving in your bed. All of these things deal with, that's the treatment that they gave him. All of the plaintiff's complaints in this case deal with quality of treatment, whether it was negligent or not. As Judge Duncan wrote in the dire opinion last year, we have long held that the decision whether or not to provide additional treatment is a classic example of a matter for medical judgment. This is just a simple case where they complain about the quality of care that Mr. Cortez received. There's no evidence of deliberate indifference in this case. And I did want to briefly talk about the 50% chance rule. I don't think the panel needs to get to the 50% chance rule. I think the fact that there's no deliberate indifference here means that the case ends on that alone. What the 50% chance rule is, when you have a 1983 case, you look to the causal link between the deliberate indifference and the injury. You look at Texas law. In Texas law, and that's the Phillips case, and that's the Slade case. In Texas law, recovery for wrongful death is barred if a condition pre-exists the negligence of the health care provider, and at the time of the negligence, the condition resulted in the patient having a 50% chance less of survival. Their own medical expert agrees. Yes, when he came into jail, he had a less than 50% chance of survival. So the wrongful death claim fails as a matter of law under Texas law. And the only case that they cite is the Smith v. Christus, and that's a case where the person's pre-existing condition, the cancer, didn't cause the death because he fell out of bed and a catheter fell out of his jugular vein and he bled to death. As the magistrate pointed out, completely separate situation from here, where the death certificate said he died of plural malignancy due to mesothelioma. So for these reasons, Your Honor, unless you have other questions, I ask that the judgment be affirmed. Thank you. Ms. Johnson. Good afternoon, Angela Aldate for the county and sheriff. And I don't want to step over what's already been discussed today. I know it's been a long day. Can you be a little louder, please? Yes, I apologize, Your Honor. I think that in the record, the bottom bunk pass issue, obviously there's no issue with deliberate indifference in that case, especially when you have the policy in the record at page 1883. Medical staff can prescribe a bottom bunk, and the reason is because otherwise everybody will take the bottom bunks and none will be available. And in this case, Mr. Cortez actually did receive one on May 22nd, or I believe maybe the 21st. Excuse me. Hitting the 50% chance rule. Can you speak to anything with respect to the duties of LVNs in jails and what standards apply to them, what they can and what they cannot do? Because, I mean, obviously I'm not a doctor. I can't tell what they can do and what they can't. And I completely understand because I come from the same kind of lay background. I'm looking up the Texas Occupations Code, and I'm trying to kind of discern what it means from that as well. But what I will say as a representative of the sheriff, that he is also not a medical doctor, a medical provider, and that's why he contracts out with Boone Chapman. That's why he contracts out with Saluda Health. That evidence is in the record at page 2012 at paragraph 9. And then at paragraph 10, he makes it very clear that the sheriff's office has written policies and procedures for managing the medical care of inmates in the Galveston County Jail, and those policies and procedures comply with the Texas Commission on Jail Standards. And so here we are with, you know, I think the conversation was exam versus assess. And so somebody comes in with shortness of breath, and they listen to the lungs. Okay, are you breathing? Are you about to pass out? And do you require emergent care at this time? And so what you see in the record in the development of these arguments is that the person says he has an issue, he goes to medical. He has an issue, he goes to medical. And at any time that the officers or the medical staff see a need for emergent care, absolutely anybody can call 911, he can go on. But I apologize. No, no, that's fine. That answers my question. Thank you. Going back to the less than 50% chance rule, Dr. Lloyd admitted that he had a less than 50% chance of survival the minute he entered the jail. That's in the record at page 1945 to 1946. And despite this record, the appellants have argued that it doesn't apply to non-med mal claims. But this court has. And I know that an opening counsel referenced the Slade case. That is a wrongful death case where an officer picked somebody up, didn't know that he was about to suffer from PCP toxicity, took him on a short ride to the jail, and at that point he collapsed and he required medical attention. That is a wrongful death case. And in that case, the Fifth Circuit, which is precedential in this case, applied and discussed the Kramer opinion from the Texas Supreme Court and the Phillips opinion as well, where they discussed the proximate causation standard. And so in that case, under Kramer and under Columbia Rio Grande Health Care, both of which are cited in our brief, the negligence causation standard in a wrongful death case and in Texas law is whether an act or omission is a substantial factor in bringing about the harm without which the harm wouldn't have occurred. And the issue there, when Kramer was kind of delving into proximate causation, is if you have somebody who has less than 50% chance of survival, there's no way they can meet the proximate causation standard. And so when you start saying that it doesn't apply, it has been applied. It's been applied in Slade. It's been applied in Montana, also cited in our brief. And I think that that's the precedent of this circuit to follow. There was a statement from counsel saying that there was no explanation of no care for several days, and I think the insinuation was that it was some kind of retaliation for a grievance that was filed. There's absolutely no retaliation claim in this case. And at the same time, if you look at the medical records, Dr. Killian had actually ordered Mr. Cortez's medical records and was awaiting them so that he could review them and get a better understanding of Mr. Cortez's medical history. And that happened in that, I think it was a three- or four-day period. Unless the court has other questions. Thank you. Thank you. Mr. Calavo? Marabono? Yes, sir. Five minutes for a vote. I just said you had five minutes for a vote. May I proceed? One of the confusing things, and I can understand why it's confusing, is this concept of the 50-50. The 50-50 refers that Texas has decided in medical malpractice case, if you have another problem with you that is going to cause your death in the future, then you can't have a wrongful death action. However, the civil rights cases have never applied that. What they have applied, though, and that's why it's confusing, is you still have to prove that the constitutional violation caused the death. It's a totally different concept, although the words are so, so similar. I can see the confusion. No case in the Fifth Circuit has ever decided that if you have some other cause of death that will kill you in the future, that that defeats a 1983 action. And the Supreme Court, and I wish I had this, but it's a common case, and the Supreme Court decided that 1983 cases are supposed to be decided with an eye to promoting 1983. Because if you read 1983, it's, like, extremely broad. It basically says, hey, we've got a law to promote civil rights. All right, go ahead and do it. It's not very detailed, so it required a lot of Supreme Court decisions and Fifth Circuit Court decisions to decide exactly what it means. So if we are now going to apply this 50-50 rule taken from Texas medical malpractice law, which, by the way, I don't think exists in Louisiana malpractice law, and it doesn't exist in Mississippi malpractice law either. And how we would apply it, really, frankly. What you say, he was going to be in jail this amount of time, and he would have died, and we've got some actuarial table or something. When would he die of this otherwise, and he's dying sooner from it than he would have because he wasn't. I don't understand how it works when it's the same illness, but it's a condition caused by the illness anyway, and being in jail. But the other side says it doesn't matter. Y'all can't show deliberate indifference, period. Right, well, once again, words sometimes sound more serious than they do because one of the words that was brought up was serious medical condition. But in Magistrate Edison's own ruling, he sets forth the standard for deliberate indifference. Where are you looking? I've got the magistrate's report up here. Yeah, maybe sometimes I have a little. Let me just grab it. Oh, yeah, here it is. He points out in the case of Petzold versus Rostelin that the prisoner must prove that delay or denial, so mere delay counts, of medical treatment in substantial harm. And here's where he qualifies that, such as additional pain. That's all it takes for a serious harm is a delay that causes additional pain. So once again, sometimes the words seem more serious than they actually are. And in this case, there's ample evidence of additional pain, and there's ample evidence of a delay. Furthermore, while there is case law that seems to indicate that the standard is so high that you basically don't have to provide any medical care, there is a case law right out of this circuit, such as the case of Spikes versus McVeigh, which was just decided on August 11th of 2021, which basically talks again about mere delay can arise. I wonder where the delay is in this case. These nurses were examining, and they found they heard clear lungs. So they're not saying we're not going to let you see the doctor. There's nothing that we can observe wrong with you. Well, that's a credibility determination once again for the jury, because jails are notorious for wanting to save money. Inmates are not politically favorable people that you want to give money to in the counties and so forth. And so what we see here is these LVNs, who, by the way, cannot diagnose or prescribe any medication, such as pain relievers, when he's complaining about pain every single time he comes there. I think there's a total of 11 times he's complained about pain and got no pain reliever. That's implying what they are doing. It could be that they're gatekeepers and that they're not providing just so that the doctor is not overburdened and so forth. They possibly could be downplaying these problems and wait. And one of our causes of action for the deliberate indifference of the county and for the medical care providers is they wait. They wait, and they wait until there's an emergency, just like in this case, just like in many cases we pointed out. They wait until it's too late. Now, maybe they get out in time, and they can go to a private care provider. However, that is a part of the deliberate indifference is that they wait. And there was another case, which basically is out of the circuit, which, oh, I did want to jump back because there is a very important piece of information in the record, and that is on 5-22 of 2017, a deputy called the medical care providers from the jail. And what he said was, and this is recorded, patient can't breathe. Now, that wasn't the patient himself saying that. It was the deputy doing an observation. And that tells us a couple things. Once he's an independent witness that he can't breathe, if you want to discredit the inmate as just he's a complainer, he's complaining he just wants attention, you can't say that when it's the deputy himself saying the patient can't breathe because he doesn't say the patient says he can't breathe. Furthermore, as a deputy, he realizes what a child will realize. I don't know how old y'all were when you realized you need air to breathe, to live, but I think I was like five or maybe four, maybe even younger, like when I jumped in some water or I tried to hold my breath to get some more candy, I realized the importance of breath. And the things that he's talking about, I can't breathe, I can't breathe, it was enough to convict a police officer when George Floyd said it, I can't breathe, and he was an interested witness, George Floyd was, but this is a deputy saying, I am observing and this guy can't breathe, yet they did nothing. And so what we see here is this is a very obvious case, and all it takes is delay that causes additional pain, and there's ample evidence of that. Anything, any questions, your honors? I'm good. All right, y'all have a good holidays. Thank you, sir. That concludes our oral arguments for this session. This court will pick up another case later, but this panel will be adjourned until 1 p.m. tomorrow for a regular one. Thank you.